**FISONS CORPORATION, Plaintiff,**

v.

**Donna SHALALA, et al., Defendants.**

**Civ. A. No. 93–1552 (CRR).**

United States District Court,
District of Columbia.

May 6, 1994.

Charles D. Bock and Mark E. Boulding of Fox, Bennett & Turner, Washington, DC (Thomas M. Fitzgerald and Karl C. Schaffenburg, Fisons Corporation, Rochester, NY, of counsel), for plaintiff.

Heidi A. Garland and Susan L. Strawn, Civ. Div., U.S. Dept. of Justice, Washington, DC, together with Frank W. Hunger, Asst. Atty. Gen., Civ. Div., and Eugene W. Thirolf, Director, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, DC (Margaret Jane Porter, Chief Counsel, Areta L. Kupchyk, and Catherine L. Lorraine, Food and Drug Administration, Rockville, MD, of counsel), for defendants.

### MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

## I. *INTRODUCTION*

Before the Court are the Plaintiff's Application for a Preliminary Injunction, the Defendants' Motion to Dismiss, and Plaintiff's Motion to Compel Production of the Administrative Record. To advance the ends of justice and further judicial economy, the Court consolidated the Plaintiff's application for a preliminary injunction with its request for permanent injunctive relief, pursuant to Fed. R.Civ.P. 65(a)(2).

Seeking declaratory and injunctive relief, Plaintiff Fisons Corporation ("Fisons") brought this action to prevent the Food and Drug Administration ("FDA") from approving abbreviated new drug applications ("ANDAs") for generic versions of Fisons' Intal Nebulizer Solution ("Intal NebSol") without requiring specific testing, information, and analysis. More specifically, Fisons claims that both (1) the FDA regulation permitting the waiver of certain testing for generic drug applications, 21 C.F.R. § 320.22(b), and (2) FDA's policy of waiving testing and approval of these generic drugs, are arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

After careful consideration of the papers filed by the parties, the arguments of counsel at oral argument, and the underlying law, the Court shall grant the Defendants' Motion to Dismiss, and deny Plaintiff's Application for a Preliminary Injunction and Plaintiff's Motion to Compel Production of the Administrative Record.

## II. *BACKGROUND*

This action was brought by a pharmaceutical company due to the expiration of a patent

for drug aiding in the treatment of asthmatics, and that company's fear that generic drugs will soon flood the market and impair its economic position. Plaintiff Fisons Corporation ("Fisons") is a manufacturer and distributor of pharmaceutical drug products, including cromolyn sodium drug products for the treatment of asthma and other diseases. Complaint, ¶¶ 11, 18. These products function as anti-inflammatory agents, and Intal NebSol—a liquid form of cromolyn sodium converted into an aerosol by a nebulizer—is inhaled by the user directly into the lungs, and does not rely on blood-stream absorption to achieve its therapeutic goal.[1] Complaint, ¶¶ 12, 15, 16, 17, 30.

The Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 98 Stat. 1585 (1984) ("Hatch–Waxman Act"), which amended the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301–392, governs the FDA's approval for applications for generic versions of pioneer drugs. Pursuant to 21 C.F.R. § 10.30, Fisons filed a Citizen Petition regarding potential generic competition to Intal NebSol on January 8, 1993. Fisons alleges that it filed this petition when it "became aware of the FDA's intention to waive *in vivo* bioequivalence testing for generic versions of Intal NebSol." Complaint, ¶ 52. After stating that such a waiver exceeded the FDA's authority, Fisons requested that Defendant David Kessler, M.D., Commissioner of the FDA, "adopt an *in vivo* bioequivalence standard for ANDAs for inhaled dosage forms of cromolyn sodium based on Intal NebSol." Complaint, ¶ 53. The FDA responded on August 6, 1993, informing the Plaintiff that the agency is still evaluating the requests made in the Petition. Defendants' Motion, Exhibit 3. On May 18, 1993, Fisons also filed a Petition for Stay of Action pursuant to 21 C.F.R. § 10.35, requesting that the FDA require a bioequivalence showing before approving any ANDAs for generic versions of Intal NebSol.

Fisons met with FDA officials on July 9, 1993, to discuss the petition. According to the Affidavit of Aaron M. Taub, Fisons' Senior Director of Regulatory Affairs:

> During the course of the meeting, FDA representatives stated that, based on the information presented by Fisons to date, FDA made a final determination that FDA will waive *in vivo* bioequivalence testing for ANDAs based on Intal NebSol. FDA representatives also stated that FDA does not require ANDA applicants to present impurity analyses to the same extent and level as that which FDA requires of applicants for full NDAs (new drug applications).

Taub Affidavit, ¶¶ 8–9; *see also* Affidavit of Robert Parker, ¶¶ 6–9. The Plaintiff alleges that in this meeting, the FDA "unequivocally" told Fisons that it will approve ANDAs for generic versions of Intal NebSol lacking any showing of bioequivalence, and that the FDA will not demand the degree of impurity analysis mandated by statute and regulations.

Fisons' patent protecting its monopoly profits on Intal NebSol expired on August 17, 1993, but despite its concern, no competitor's generic product has been approved since that time. The FDA responded to the Petitions on March 31, 1994, denying both (1) Fisons' request that the agency require a demonstration of bioequivalence through comparative clinical trials for the generic counterparts of Intal NebSol, and (2) Fisons' request that the FDA establish special controls for nebulizers. FDA's Response to Fisons' Citizen Petition, at 8–9.[2]

## III. THE PLAINTIFF HAS STANDING TO CHALLENGE THE FDA'S REGULATIONS UNDER THE CONSTITUTIONAL AND PRUDENTIAL PREREQUISITES TO STANDING, AS WELL AS THE FDA'S OWN REGULATIONS.

The parties agree that a challenger to agency action under an APA claim must

---

1. A drug such as Intal NebSol that does not depend on systemic absorption to bring about its therapeutic effect is known as a "nonsystemically absorbed drug," or NSED.

2. This Response postdated the filing of the Complaint as well the dispositive motion and the responses thereto.

meet both prudential and constitutional standing requirements. *Hazardous Waste Treatment Council v. Thomas ("HWTC IV")*, 885 F.2d 918, 921 (D.C.Cir.1989).

■ Fisons satisfies the injury-in-fact test for constitutional standing. Under this test, a petitioner must assert "an injury in fact, fairly traceable to the challenged actions of the respondent, and likely to be redressed by a favorable court ruling." *Associated Gas Distributors v. FERC*, 899 F.2d 1250, 1259 (D.C.Cir.1990). In challenging Fisons' Article III standing to bring this action, the FDA makes two arguments. First, it claims that the alleged injury that is the basis for this suit, the approval of a generic competitor and the consequent loss of a monopoly market, is almost inevitable, even if Fisons prevails on the merits in this case. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). However, this argument misstates Fisons' claim. As argued by the Plaintiff, it does not seek to ban the approval of generic competitors, but to prevent improper approvals lacking the testing that it believes is mandated by statute. Fisons is correct in stating that if it were to prevail on the merits of its case, its generic competitors will not have obtained an unfair advantage that would improperly reduce Fisons' profits and market share, and that a favorable court ruling is likely to redress that injury.

Second, the FDA challenges Fisons' standing on the grounds that its loss of profits is too speculative, because no Intal NebSol competitor has been approved. In an action brought by a gas association challenging the Federal Energy Regulatory Commission's interpretation of a statute, this Circuit stated:

> [w]e find here ... that petitioners sufficiently establish their constitutional standing by showing that the challenged action authorizes allegedly illegal transactions that have the clear and immediate potential to compete with the petitioners' own sales. They need not wait for specific, allegedly illegal transactions to hurt them competitively.

*Associated Gas Distributors v. FERC*, 899 F.2d 1250, 1259 (D.C.Cir.1990). Therefore, this Court finds that the alleged injuries are not too speculative, because of the "clear and immediate potential" for an improper FDA approval of a generic drug to hurt Fisons competitively.

■ Fisons also meets the "zone of interests" test for prudential standing. This test is based on the notion that Congress may not specify which parties may invoke judicial power to enforce the terms of a statute, and that the judiciary must therefore inquire into Congressional intent. There are two types of parties possessing the appropriate incentives to monitor an agency's enforcement of administrative laws: (1) Regulated interests, who are the object of regulation and have the interest to watch for an excessive burden imposed by an agency, beyond legislative contemplation; and (2) Protected interests, parties who are supposedly protected by the agency, to make sure that the protection is to the full extent intended by Congress. *HWTC IV*, 885 F.2d at 921–22. Along with intended beneficiaries, the D.C. Circuit also included in the class of protected interests "suitable challengers" possessing a "marginal relationship" to statutory purpose, who are those parties "whose interests, while not in any specific or obvious sense among those Congress intended to protect, coincide with the protected interests." *Id.* at 922–924.

■ Fisons is correct in asserting that Congress intended the Hatch–Waxman Act to benefit pioneer drug manufacturers, and therefore falls within the Act's "zone of interest." Title I of the Act included a series of provisions granting FDA exclusive extensions for innovations by pioneer manufacturers like Fisons. A variety of federal courts have recognized that this Act represents a compromise, and aids both sets of drug manufacturers. *See, e.g., Tri–Bio Laboratories, Inc. v. United States*, 836 F.2d 135, 139 (3rd Cir.1987) (noting that the Hatch–Waxman Act reflected a statutory compromise between generic and pioneer drug manufacturers, and that the Act also provided several market advantages for pioneer drug manufacturers), *cert. denied*, 488 U.S. 818, 109 S.Ct. 57, 102 L.Ed.2d 35 (1988). Upon examining the entire structure of Title I, and recognizing the breadth of the statutory

scheme, the Court is sufficiently convinced that Congress intended to benefit pioneer drug manufacturers enough to warrant standing for Fisons in this case.[3]

## IV. THE WAIVER PROVISION OF 21 C.F.R. § 320.22, CONCERNING THE FDA'S WAIVER OF IN VIVO BIOE-QUIVALENCE TESTING IN CERTAIN SITUATIONS, DOES NOT EXCEED THE STATUTORY AUTHORITY PRESCRIBED BY 21 U.S.C. § 355(j)(7)(B).

In the First Claim for Relief in its Complaint, Fisons alleges that without a bioequivalence showing, the FDA's approval of Intal NebSol would violate the APA. Complaint, ¶ 76. More specifically, Fisons contends that "FDA's waiver regulation, 21 C.F.R. § 320.-22(b), exceeds the agency's authority. As a consequence of the Hatch–Waxman Act, FDA cannot waive bioequivalence testing for any drug." *Id.*, ¶ 75. The Government counters that its regulation does not permit the waiver of the bioequivalence requirement. Rather, the FDA argues that this regulation merely permits certain discretion to the agency in carrying out the existing regulations by allowing it to waive *in vivo* testing requirements in certain situations.

### A. STANDARD OF REVIEW.

The Supreme Court has laid out the path of judicial review for the regulatory challenge at issue in the instant litigation. The landmark case of *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) mandates that a reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and emphasizes that under this narrow scope of review, "[t]he court is not empowered to substitute its judgment for that of the agency." *Id.* at 416, 91 S.Ct. at 823. In a case involving an agency's interpretation of a statute, such as

the one presently before the court, *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) provides further guidance to the reviewing court:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781 (footnotes omitted).

### B. THE REGULATION IN ISSUE DOES NOT EXCEED THE FDA'S STATUTORY AUTHORITY.

After reviewing the text, precedents, and legislative history of the Hatch–Waxman Amendments, the FDA's regulatory scheme enforcing those amendments, and their interpretation in case law, the Court concludes that the FDA's promulgation of 21 C.F.R. § 320.22(b) is within the FDA's statutory authority. Because Congress' intent was clear, and consistent with the FDA's waiver of specific testing requirements where the appropriate indications of bioequivalence exist, the Court shall not go beyond step one of the *Chevron* analysis in reaching this conclusion.

The statutory and regulatory background to the Government's approval of generic drugs plays a pivotal role in this analysis.

---

3. Both parties also argue that the FDA's regulations supports their respective contentions. Fisons argues that the FDA regulations bar the FDA from raising standing in this litigation, because Fisons is an "interested person" aggrieved by "final agency action." *See* 21 C.F.R. §§ 10.3, 10.45(d)(1), 10.85(d). The FDA responds that the regulations mandate dismissal for lack of standing, due to the lack of final agency action. Construing the Complaint liberally, the Court finds that FDA regulations do not preclude the Plaintiff from bringing this action.

Enacted in 1938, the FDCA originally required that a manufacturer seeking to market a new drug product need only establish the safety of that drug for its intended uses. As a result of the 1962 amendments to the FDCA, a manufacturer trying to obtain FDA approval of a new drug[4] must submit and receive approval of a new drug application ("NDA"), which must provide information on the safety and effectiveness of the drug's intended uses. 21 U.S.C. §§ 331(d), 355. The 1962 amendments also substantially changed the approval process for generic versions of drugs. Prior to 1962, the FDA approved "abbreviated" new drug applications ("ANDAs") for drugs similar to other approved drugs. Under these amendments, approval of the generic version of a pre–1962 drug could be obtained through the ANDA procedure, but approval of a generic version of a post–1962 drug required the full NDA process.

In a 1977 codification, the FDA defined bioavailability and bioequivalence in drug products.[5] Section 320.22(b) of the 1977 regulations, also set out the conditions for the waiver of *in vivo* testing: "For certain drug products the in vivo bioavailability of the drug product may be self evident or not necessary for the product to achieve any of its intended purposes." Furthermore, under this section, the FDA "shall waive the requirement for the submission of evidence obtained in vivo demonstrating the bioavaila-

bility of the drug product" if that product met certain criteria, or was considered to be a cream, antacid, or other dosage form.

The 1984 Hatch–Waxman Amendments introduced a relaxation of the approval system for generic versions of drug products approved after 1962. More specifically, 21 U.S.C. § 355(j) established an ANDA system for these generics, requiring that an ANDA provide, among other things, information that the generic drug is as effective as the pioneer. Furthermore, the ANDA must include information demonstrating that the generic drug is bioequivalent to the pioneer drug. 21 U.S.C. § 355(j).

The FDA published ANDA regulations in response to the Hatch–Waxman Amendments on April 28, 1992. 57 Fed.Reg. 17,950. With regard to bioequivalence testing of generic drugs, these regulations generally followed the methodology set forth in the 1977 regulations.[6] More specifically, the *new* § 320.22(b) states:

For certain drug products, the in vivo bioavailability or bioequivalence of the drug product may be self-evident. FDA shall waive the requirement for the submission of evidence obtained in vivo demonstrating the bioavailability or bioequivalence of these drug products. A drug product's in vivo bioavailability or bioequivalence may be considered self-evident based on other

---

4. According to 21 U.S.C. § 321(p), a "new drug" is a drug lacking general recognition by qualified experts "as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof...."

5. According to these provisions, bioavailability "means the rate and extent to which the active drug ingredient or therapeutic moiety is absorbed from a drug product and becomes available at the site of drug action." Bioequivalent drug products are essentially
  pharmaceutical equivalents or pharmaceutical alternatives whose rate and extent·of absorption do not show a significant difference when administered at the same molar dose of the therapeutic moiety under similar conditions, either single dose or multiple dose....
  42 Fed.Reg. at 1648 (January 7, 1977), 21 C.F.R. § 320.1(a), (e).

6. The 1992 regulations modified some of the relevant terms:

(a) *Bioavailability* means the rate and extent to which the active ingredient or active moiety is absorbed from a drug product and becomes available at the site of action. For drug products that are not intended to be absorbed into the bloodstream, bioavailability may be assessed by measurements intended to reflect the rate and extent to which the active ingredient or active moiety becomes available at the site of action.
  ....
(e) *Bioequivalence* means the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study....
  21 C.F.R. § 320.1.

data in the application if the product meets one of the following criteria:

> (1) The drug product: (i) Is a parental solution intended solely for administration by injection or an ophthalmic or otic solution....
>
> (2) The drug product: (i) Is administered by inhalation as a gas, e.g., a medicinal or an inhalation anesthetic....
>
> (3) The drug product: (i) Is a solution for application to the skin, an oral solution, elixir, syrup, tincture, or similar other solubilized form.

21 C.F.R. § 320.22(b).

In examining Congress' intent in the Hatch–Waxman Act and the interpretation of that Act in the Courts, both parties rely heavily on *Schering Corp. v. Sullivan,* 782 F.Supp. 645 (D.D.C.1992) (Boudin, J.), *vacated as moot, sub nom., Schering Corp. v. Shalala,* 995 F.2d 1103 (D.C.Cir.1993) to support their arguments over whether the regulation at issue exceeds the scope of statutory authority. The court in that case granted the Government's summary judgment motion where the manufacturer of a similar respiratory product sought to preliminarily enjoin the FDA's approval of a generic drug under Section 355(j). After examining the background of the Hatch–Waxman Act, Judge Boudin held that in its 1977 regulation concerning bioequivalence, the FDA reasonably interpreted the underlying statute in determining that the FDA must impose some form of bioequivalence finding in approving generic versions of drugs. *Schering,* 782 F.Supp. at 651. Even though the promulgation of the 1992 regulations mooted this case, both sides cite *Schering* extensively and expressly rely on its statutory and legislative analysis. *See* Defendant's Motion to Dismiss, at 31 n. 18; Plaintiff's Application, at 25–26 n. 13. Furthermore, in the recently decided follow-up to that case, a district court in the Third Circuit declared that "[t]he court adopts the reasoning of Judge Boudin in the parties' identical case before him in the Federal District Court for the District of Columbia. *See Schering,* 782 F.Supp. at 648–51." *Schering Corp. v. Food and Drug Administration,*

Civil Action No. 93–3493, slip op. at 11 (D.N.J. April 26, 1994).

The Court agrees with the Government that the relevant 1992 regulations are essentially identical to the 1977 regulations,[7] and that *Schering*'s analysis of Congressional intent in enacting the Hatch–Waxman Act similarly indicates that the challenged regulation is consistent with that Act. In stating that the core of its claim is "that the FDA is not requiring a finding of bioequivalence for nebulizer solutions—exactly the FDA action which the *Schering* court stated was unacceptable after the enactment of the Hatch–Waxman Act," Plaintiff's Opposition at 36, the Plaintiff misreads what *Schering* actually stands for in this context. After a thorough review of the legislative history, Judge Boudin specifically emphasized that "Congress did not intend to restrict the FDA's discretion to determine *how* the bioequivalence requirement is to be met...." *Schering,* 782 F.Supp. at 651 (emphasis added). Instead, the discretion for such determinations must be based on a "reasonable and scientifically supported criterion, whether it chooses to do so on a case-by-case basis or through more general inferences about a category of drugs or dosage forms." *Id.* (footnote omitted). Consistent with these holdings, the FDA *is* requiring a finding of bioequivalence, but as part of its expertise or discretion in making that finding, may elect to waive certain testing procedures where the make-up of pioneer and generic products are similar in all pertinent ways.

Judge Boudin stated at length that Congress intended to perpetuate prior FDA procedures, including those pertaining to bioequivalence set forth in the 1977 regulations:

> Here, the intent behind Section 355(j)(7)(B) is clear from the language, structure, and legislative history of the 1984 amendments to the FDCA, all of which suggest that Congress permitted the FDA to retain its historically wide discretion in defining showings of "bioequivalence." ...
>
> ....

---

7. In fact, the legislative history of the Hatch–Waxman Amendments only mentioned bioequivalence once, directly citing the 1977 regulations. *Schering,* 782 F.Supp. at 650.

The legislative history of the 1984 amendments to the FDCA, which enacted the abbreviated application procedure set forth in Section 355(j), indicates that Congress generally meant to accept the pre-existing procedures for determining bioequivalence that were codified by the FDA in 1977. . . . [It] evinces a clear intent to accept the FDA's then-existing methods of approving generic drug applications.

*Schering,* 782 F.Supp. at 648, 650. Congress intended to apply the approval procedures for generic versions of pre–1962 drugs to all generic drugs. *See* H.R.Rep. No. 857 (Part I), 98th Cong., 2d Sess. 14 (1984) U.S.Code Cong. & Admin.News 1984, 2647, 2647 ("Title I of the [Hatch–Waxman Amendments] generally extends the procedures used to approve generic copies of pre–62 drugs to post–62 drugs"). Therefore, *Schering* supports the Government's contention that the FDA's promulgation of 21 C.F.R. § 320.22(b) is consistent with Congressional intent, and undercuts Fisons' APA challenge.

The FDA's waiver provision is well within the scope of its broad discretion. Fisons cannot point to any legislative history that mandates that the FDA undertake a given methodology, and Congress' silence on this matter strengthens the FDA's argument that its regulations are consistent with legislative intent. As the Supreme Court has noted:

To be sure, it may not always be realistic to infer approval of a judicial or administrative interpretation from congressional silence alone. . . . But once an agency's statutory construction has been "fully brought to the attention of the public and the Congress," and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.

*United States v. Rutherford,* 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 2476 n. 10, 61 L.Ed.2d 68 (1979) (citations omitted); *see also Young v. Community Nutrition Institute,* 476 U.S. 974, 983, 106 S.Ct. 2360, 2365, 90 L.Ed.2d 959 (1986) (stating that a "congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress") (quoting *NLRB v. Bell Aerospace, Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974)). The sort of ANDA approvals at issue are not an insignificant occurrence, and not likely to evade the legislature. The FDA has approved some 750 generic drug solutions as bioequivalent to pioneer drugs, pursuant to 21 C.F.R. 320.22(b), and these "750 approvals constitute approximately 21% of the total number of ANDAs approved since September 24, 1984." Declaration of Donald B. Hare, ¶ 5. Since 1984, Congress has not altered these amendments or the Government's discretion in making bioequivalence determinations. Therefore, this legislative inaction indicates Congress has intended, or at least accepted, the FDA's procedures.

The waiver regulation in issue also comports with the structure and broader policy objectives of the Hatch–Waxman Act. Congress sought to further two competing goals by passing this bill—to make more affordable generic drugs available, and to protect the public by making sure these generic drugs are safe before they are put on the market. *See, e.g., Schering,* 782 F.Supp. at 650–51 (citing *Tri–Bio Laboratories, Inc. v. United States,* 836 F.2d 135, 139 (3rd Cir.1987)). On the basis of this statutory framework, Judge Boudin concluded that "judicial review of specific abbreviated drug approvals, along with the underlying finding of bioequivalence, will remain an available avenue to strike the balance that Congress seems to have intended." *Id.* at 651.

In sum, the FDA's regulations are consistent with their statutory background, because the agency does not attempt to waive bioequivalence determinations. Rather, the regulation in question permits the waiver of a discrete, specific form of *in vivo* testing for those categories of drugs where "in vivo bioavailability or bioequivalence of the drug product may be considered self evident based on other data in the application . . ." 21 C.F.R. § 320.22(b). In the event that the FDA one day misapplies its own regulations, exceeding its statutory authority, a challenge to an improperly approved drug would be appropriate; that hypothetical, however, is not the case before the Court. Thus, the factual

determination of how bioequivalence is determined properly rests within the FDA's discretion.

## V. THE COURT MUST DISMISS FISONS' ALLEGATIONS OF A WAIVER POLICY THAT EXISTS OUTSIDE OF THE REGULATIONS.

### A. WITH RESPECT TO IMPURITIES, FISONS' CLAIM THAT THE FDA INTENDS TO HOLD ANDA APPLICANTS TO A LOWER STANDARD THAN THAT PERMITTED BY STATUTE IS NOT RIPE.

Fisons claims that in practice, the FDA requires less information regarding ANDA's compared to NDA's, and that the ANDA information fails to conform with the FDCA and FDA's own regulations. Complaint ¶ 82. In addition, Fisons alleges that the FDA will require ANDA applicants to supply a lesser degree of analysis than required of Fisons, and that the FDA intends to hold ANDA applicants to a lesser showing than that required by the statute. Complaint, ¶¶ 83, 84.

Such assertions are premature. At present, FDA is bound by a detailed, specific procedure for analyzing the impurities in each ANDA application. As Fisons repeatedly stated in its Complaint, FDA's regulations for ANDAs are stringent. For example, pursuant to statute, FDA will reject an ANDA, unless "the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are adequate to assure and preserve its identity, strength, quality and purity." 21 U.S.C. § 355(j)(3)(A). *See also* 21 C.F.R. §§ 314.-50(d)(1), 314.94(a)(9). Due to the drug-by-drug procedure for impurity analysis of generic drugs set forth in these regulations, the Court cannot evaluate Fisons' claim at this time.

### B. STATEMENTS BY FDA EMPLOYEES DURING INFORMAL MEETINGS DO NOT CONSTITUTE FINAL AGENCY ACTION.

Fisons also alleges that during the July 9, 1993 meeting with FDA officials, those officials stated that 21 C.F.R. § 320.-22(b) applies to generic versions of Intal NebSol, and that the FDA intends to waive bioequivalence testing for those ANDAs. Complaint, ¶ 68. Furthermore, Fisons claims that it and its counsel have had "other meetings and telephone conferences" with FDA discussing bioequivalence showings, and that FDA representatives made numerous public statements on other occasions regarding the intent to treat impurity analyses for generics differently. *See* Complaint, ¶¶ 51, 70; Plaintiff's Application at 24. According to the Plaintiff, FDA's statements during the July 9, 1993 meeting were its "final answer" on the waiver issue. Plaintiff's Application at 18. As a consequence of such meetings and statements, Fisons alleges that these FDA actions constitute a practice and policy of waiving the bioequivalence requirement.

The Court agrees with the Government that these meetings, conferences, and statements are not final agency actions and may therefore not be challenged under the APA. *See Public Citizen Health Research Group v. FDA,* 740 F.2d 21, 30 (D.C.Cir.1984) (stating that "finality is primarily concerned with protecting the integrity of the *administrative* process"). Fisons' attempt to portray informal statements made by FDA officials as final agency actions is unpersuasive. Plaintiff cites *Her Majesty the Queen in Right of Ontario v. EPA,* 912 F.2d 1525 (D.C.Cir. 1990), for the proposition that an agency cannot elude finality of an action by choosing an informal mode of response such as a letter. However, unlike *Her Majesty,* in which an administrator apparently tried to sidestep the rulemaking procedure by informal communication, the FDA has conclusively and formally spoken on the waiver issue, and followed the appropriate rulemaking procedures before implementing 21 C.F.R. § 320.22(b). Moreover, Fisons did not even comment on the regulation at the time of promulgation, and should not be permitted to do so belatedly.

The regulations and case law support the Government's position. In contrast to Fisons' contentions, 21 C.F.R. § 10.65(a) explicitly eliminates from judicial review statements made by FDA employees during meet-

ings, stating that "[a]ction on meetings and correspondence does not constitute final administrative action subject to judicial review under § 10.45." Even more significantly, another provision of FDA regulations further emphasizes the non-finality of statements such as those at issue here:

> A statement made or advice provided by an FDA employee ... is an informal communication that represents the best judgment of that employee at that time but does not constitute an advisory opinion, does not necessarily represent the formal position of FDA, and does not bind or otherwise obligate or commit the agency to the views expressed.

21 C.F.R. § 10.85(k). The indirectness and lack of immediacy of this case militates against judicial review at this time, because there is no apparent hardship arising from a delay until the time, if any, when the ANDA for a generic competitor of Intal NebSol is actually approved. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Therefore, Fisons' assertion of finality is unsupported and not ripe for judicial review on both the waiver and impurity issues.[8]

## VI. THE GOVERNMENT HAS NO NEED TO PRODUCE AN ADMINISTRATIVE RECORD, IN THAT THE PLAINTIFF'S CLAIM IS ESSENTIALLY A STATUTORY CHALLENGE TO A REGULATION.

■ Fisons argues that its case is a procedural challenge to the promulgation of a regulation, and that the FDA lacks the statutory discretion to enact the waiver regulation in question. Therefore, according to the Plaintiff, this promulgation is a final agency record, and the production of this record would enable it to receive injunctive relief.

The Court does not agree. As indicated by the Government at the Motions Hearing, this challenge is not factually based in asserting errors of procedure in promulgating 21 C.F.R. § 320.22(b), but is a statutory challenge to a regulation. Therefore, documents are not necessary or relevant for the assertion that the regulation is inconsistent with the Hatch–Waxman Amendments.

## VII. CONCLUSION

For all the reasons previously stated, the Defendants' Motion to Dismiss shall be granted and the Plaintiff's Application for Injunctive Relief shall be denied. FDA waiver regulation 21 C.F.R. § 320.22(b) does not exceed its statutory authority, and the FDA has no existing waiver policy outside of that regulation for the testing of generic drugs. The Court shall enter an Order of even date herewith in accordance with this Opinion.

---

**8.** Fisons claims that none of the waiver provisions set out in 21 C.F.R. § 320.22(b) apply to drugs that are nebulized for administration like Intal NebSol. Therefore, according to the Plaintiff, Intal NebSol does not fit within a category for which bioequivalence is deemed self-evident. The Plaintiffs even assert that the Defendants' denial of its policy regarding waiver of bioequivalence testing borders on bad faith: "FDA has a firm policy to waive any bioequivalence testing

for nebulizer solutions. That policy is what is at issue here. Defendants should not be permitted to defend it through distorting and concealing it." Plaintiff's Opposition at 7.

Because the Court finds that there is no such waiver policy, the Court does not address this issue, except to note that the technical categorization of Intal NebSol generic competitors is best left to the FDA's expertise when an application is actually before the agency.