**SCHERING CORPORATION, Plaintiff,**

**v.**

**Louis W. SULLIVAN, et al., Defendants.**

**Civ. A. No. 90–1804(MB).**

United States District Court,
District of Columbia.

Jan. 17, 1992.

Robert P. Reznick, Hughes, Hubbard & Reed, Washington, D.C., for Schering Corp.

Alvin J. Lorman, Akin, Gump, Hauer & Feld, Washington, D.C., for Copley.

R. Anthony Howard, King & Spaulding, Washington, D.C., for Agvar.

Heidi A. Garland, Jeffrey Chasnow, U.S. Dept. of Justice, Washington, D.C., for Louis W. Sullivan, et al.

## MEMORANDUM OPINION

BOUDIN, District Judge.

The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301–394, provides that generic drugs may be approved pursuant to an abbreviated application procedure. 21 U.S.C. § 355(j). To receive such approval an applicant must show, among other things, that the generic drug is "bioequivalent" to a previously approved drug.[1] 21 U.S.C. §§ 355(j)(2)(A)(iv), (j)(3)(F). The FDCA further provides that a new drug "shall be considered to be bioequivalent to a listed [i.e., previously approved] drug" if the rate and extent of absorption of the new drug do not significantly differ from the rate and extent of absorption of the listed drug, or if the extent of absorption of the new drug does not significantly differ from that of the listed drug and the rate of absorption of the new drug has been intentionally modified. 21 U.S.C. § 355(j)(7)(B).

The Food and Drug Administration ("FDA"), the federal agency responsible for administering the FDCA, decided that a generic drug may satisfy the bioequivalence requirement even if it does not satisfy the precise standards set forth in Section 355(j)(7)(B). See FDA Letter to Schering Corporation Responding in Part to Its Citizen Petition and Petition for Stay of Action Dated December 4, 1989 (June 4, 1990) ("FDA Decision"), Administrative Record ("AR") Tab 6. That section, says the FDA, simply creates a "safe harbor"

for determining bioequivalence; that is, it ensures that, if one of the two specified showings is made, the new drug *must* be deemed bioequivalent to the approved drug. Plaintiff Schering Corporation ("Schering") contests this interpretation, and claims that all applicants must make one of the two showings described in Section 355(j)(7)(B) in order to establish bioequivalence.

This case comes before the Court on Schering's and the federal defendants' cross-motions for summary judgment.[2] Oral argument was heard on April 30, 1991, and the matter was taken under advisement. On December 16, Schering moved to preliminarily enjoin the FDA's approval under Section 355(j) of a generic drug produced by Copley Pharmaceuticals, Inc. ("Copley"). Copley was granted leave to intervene in this action, and filed an opposition to Schering's motion for a preliminary injunction. The Court heard oral argument on the latter motion on January 9, 1992.

The central issue presented by all of these motions is whether the FDA's interpretation of Section 355(j)(7)(B) is proper,[3] and the issue is a significant one with legitimate arguments on both sides. Since the Court concludes that the FDA's interpretation is consistent with the language of the FDCA and with its legislative history, the federal defendants' motion for summary judgment is granted. Schering's motion for summary judgment and motion for a preliminary injunction are denied, and its complaint is dismissed.

## I. BACKGROUND

Schering manufactures and distributes a number of "nonsystemic" pharmaceutical

---

**1.** In scientific terms, drugs are considered bioequivalent if they "display comparable bioavailability when studied under similar experimental conditions." Bioavailability in turn "describes the rate and extent to which the active drug ingredient or therapeutic ingredient is absorbed from a drug product and becomes available at the site of the drug action." FDA, *Approved Drug Products With Therapeutic Equivalence Evaluations* 1–2 (10th ed.1990).

**2.** Intervenor-defendant Agvar Chemicals, Inc. also filed an opposition to Schering's motion for summary judgment.

**3.** The parties agree that FDA approval of the Copley product has mooted the ripeness question raised in the FDA's motion to dismiss, which was filed with its motion for summary judgment. Defendants further argue that the Copley approval would have been proper even under the narrow statutory interpretation being urged by Schering. Because the Court rejects Schering's reading of the FDCA, it need not consider this alternative argument.

drugs. In simple terms, a nonsystemic drug is applied directly to the site of the drug action (*e.g.*, ointment), rather than absorbed as a result of the drug's general dispersion throughout the body (*e.g.*, capsule).[4] On December 4, 1989, Schering petitioned the FDA to: (1) deny all applications for abbreviated approval of nonsystemic drugs; (2) refuse to disclose safety and efficacy data of nonsystemic drugs that have been approved pursuant to the full application process; and (3) refuse to disclose the safety and efficacy data for Schering's nonsystemic drugs. Citizen Petition and Petition for Stay of Action from Schering Corporation ("Schering Petition"), AR Tab 1. In essence, Schering argued that the bioequivalence requirement could be satisfied only by making one of the two precise showings set forth in Section 355(j)(7)(B); that, under available methods of scientific experimentation, such a showing could not be made for nonsystemic drugs; and, therefore, that abbreviated applications for such drugs could not be approved. *Id.* at 3–4. Additionally, Schering argued that the FDA should not release safety and effectiveness data for approved nonsystemic drugs until generic versions can properly be approved pursuant to the abbreviated application process. *See* 21 U.S.C. § 355(*l*)(5).

On May 23, 1990, Schering submitted to the FDA supplemental documents in support of its contention that nonsystemic drugs presently cannot satisfy Section 355(j)(7)(B). AR Tab 3. In light of the urgency of Schering's requested relief, the FDA elected to respond only to the legal questions raised by the petition, and to defer deciding the scientific questions. *See* FDA Decision at 1 n. 1. The FDA then concluded that the FDCA does not preclude approval of abbreviated applications for nonsystemic drugs. In particular, the FDA reasoned that Section 355(j)(7)(B) does not set forth the exclusive statutory definition of bioequivalence.[5] *Id.* at 6–7. Accordingly, the FDA denied Schering's request for relief. *Id.* at 21. Schering filed the present action on August 1, 1990.

Schering now challenges the FDA's interpretation of Section 355(j)(7)(B), and requests that the Court: (1) declare that Section 355(j)(7)(B) provides the exclusive definition of bioequivalence; (2) enjoin the FDA from approving any abbreviated applications for generic versions of nonsystemic drugs manufactured by Schering, and suspend the approval previously granted to Copley; (3) declare that Section 355(*l*)(5) does not require the disclosure of any safety and effectiveness data for nonsystemic drugs until it can be shown that those drugs satisfy the bioequivalence requirement; and (4) enjoin the disclosure of safety and effectiveness data for Schering's own nonsystemic drug products. Because the Court disagrees with the first proposition as a matter of law, and because the equities of this case do not support Schering's suggestion that it is entitled to emergency injunctive relief preliminary to a factual challenge of the Copley approval, the requested relief is denied *in toto*.

## II. ANALYSIS

### A. *Summary Judgment Motions*

Taking the legal issue presented to be ripe for adjudication, *see supra* note 3, it is also appropriate for summary judgment. Schering has raised a pure question of statutory interpretation, which is independent

---

4. For example, Schering manufactures Lomitrin, "a topically administered antifungal agent," and Proventil, "an asthma relief medication administered through metered dose inhalers." Schering's Statement of Material Facts at 1, ¶ 2. Copley's albuterol sulfate solution for inhalation, the product which the FDA has approved and which Schering seeks to preliminarily enjoin, is being offered as a generic copy of Proventil.

5. The FDA also rejected Schering's argument that nonsystemic drugs are not "absorbed" and, therefore, cannot satisfy Section 355(j)(7)(B). It likewise decided that the rate and extent of absorption of a nonsystemic drug might be measured indirectly, and that such a measurement would satisfy Section 355(j)(7)(B). *See* FDA Decision at 6–12. Schering does not contest either of these conclusions, but does contest any suggestion that "bioequivalence" may be demonstrated by data that is not correlated, either directly or indirectly, to rate and extent of absorption. *See* Transcript of Summary Judgment Hearing at 14.

of any factual dispute and may be decided as a matter of law under Fed.R.Civ.P. 56. The parties appear to agree that the briefs submitted and argument presented suffice for a final decision on the merits of Schering's original complaint.

■ The first step in the Court's inquiry is to determine, using traditional tools of statutory construction, whether Congress had "an intention on the precise question at issue." *Chevron USA, Inc. v. NRDC,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984); *Amalgamated Transit Union v. Skinner,* 894 F.2d 1362, 1368 (D.C.Cir.1990). If so, that is the end of the inquiry. In order to ascertain Congressional intent, the Court looks to the language in question, the structure of the statute as a whole, "and, where appropriate, legislative history." *Amalgamated Transit,* 894 F.2d at 1368. If, after undertaking such an analysis, the Court concludes that the statute is ambiguous or silent on the issue, it must defer to the agency's interpretation so long as it is reasonable and consistent with the purpose of the statute. *See Chevron,* 467 U.S. at 844–45, 104 S.Ct. at 2782–83.

■ Here, the intent behind Section 355(j)(7)(B) is clear from the language, structure, and legislative history of the 1984 amendments to the FDCA, all of which suggest that Congress permitted the FDA to retain its historically wide discretion in defining showings of "bioequivalence." Moreover, even if the statute had been ambiguous or silent on the issue, the Court nonetheless would be constrained to uphold the FDA's interpretation as a reasonable one, given the agency's established practice of accepting alternative showings of bioequivalence and the lack of any evidence that Congress intended to override that practice.

Section 355(j)(2)(A)(iv) of the FDCA requires an applicant for abbreviated approv-al of a generic drug to provide "information to show that the new drug is bioequivalent to the listed drug," unless the new drug has a different active ingredient, dosage form, route of administration, or strength than the listed drug.[6] *See* 21 U.S.C. §§ 355(j)(2)(A)(iv), (j)(2)(C); *see also* 21 U.S.C. § 355(j)(3)(F) (abbreviated application may be denied if information submitted is insufficient to show bioequivalence). The only express statutory guidance for making this determination of bioequivalence is found in Section 355(j)(7), which reads in its entirety:

For purposes of this subsection:

(A) The term "bioavailability" means the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug and becomes available at the site of drug action.

(B) A drug shall be considered to be bioequivalent to a listed drug if—

(i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or

(ii) the extent of absorption of the drug does not show a significant difference from the extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses and the difference from the listed drug in the rate of absorption of the drug is intentional, is reflected in its proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug.

Standing alone, the plain language of Section 355(j)(7)(B) does not support Scher-

---

**6.** In the event that the new drug differs from the listed drug in one of the above respects, the applicant must petition FDA to receive an abbreviated application. 21 U.S.C. § 355(j)(2)(C). If that petition is granted, the applicant then must show (i) that the active ingredients of the new drug are in the same pharmaceutical class as the active ingredients in the approved drug, and (ii) that "the new drug can be expected to have the same therapeutic effect as the [approved] drug." 21 U.S.C. § 355(j)(2)(A)(iv).

649

ing's argument that this section provides an exclusive test for establishing bioequivalence. The section does provide that a new drug "shall be considered to be bioequivalent to a listed drug" if either of the two specified showings are made. At the very least, this language means that, if an applicant makes one of the two showings, that applicant is statutorily entitled to a finding of bioequivalence. It is far from apparent, however, that the language does anything more than delineate this "safe harbor." There simply is no indication that the enumerated showings are the exclusive means for establishing bioequivalence. In short, while the plain language of Section 355(j)(7)(B) does not foreclose the possibility that it sets forth the exclusive showings necessary to establish bioequivalence, at the same time that language does not, by itself, impose such a meaning.

The absence of language indicating that Section 355(j)(7)(B) provides the exclusive means for determining bioequivalence becomes significant when the two subsections of Section 355(j)(7) are read together. Subsection (j)(7)(A) provides that bioavailability "*means* the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug or becomes available at the site of drug action" (emphasis added). Such language clearly indicates that "bioavailability" means what the statute says and no more. *See Weinberger v. Hynson, Westcott and Dunning, Inc.*, 412 U.S. 609, 630, 93 S.Ct. 2469, 2483, 37 L.Ed.2d 207 (1973) (similar language in 21 U.S.C. § 355(d) read to provide exclusive definition). An inveterate rule of statutory construction is that if one section of a statute contains a limiting term and a related section does not, the omission can be presumed intentional. *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300–01, 78 L.Ed.2d 17 (1983); *Adams v. Slonim*, 924 F.2d 256, 258 (D.C.Cir.1991). Here, the inclusion of limiting language in subsection (j)(7)(A), in contrast with the absence of such language in subsection (j)(7)(B), suggests that subsection (j)(7)(B) was not intended to provide the exclusive definition of bioequivalence. Additionally, it is significant that, if Congress had so

intended, ordinary boilerplate language could easily have been employed to give Section 355(j)(7)(B) the meaning urged by Schering. Indeed, comparable limiting language is found throughout Section 355. *See, e.g.*, 21 U.S.C. § 355(d) ("the term 'substantial evidence' *means....*") (emphasis added).

Given the ease with which Section 355(j)(7)(B) could have been drafted to reflect an exclusive meaning, and given Congress' failure to employ limiting language in this instance, the Court is unwilling to read into the statute any terms that were not supplied by Congress. The Court concludes that Section 355(j)(7)(B) must be interpreted to mean what it says and nothing more: a drug shall be considered to be bioequivalent to an approved drug whenever either of the two showings set forth in that section is met. Thus, the plain language of Section 355(j)(7)(B), when read in light of the statute taken as a whole, itself provides sufficient support for the FDA's decision to deny the Schering Petition.

Moreover, not only does Section 355(j)(7)(B) fail to rule out the possibility that other showings might be used to establish bioequivalence, another section affirmatively suggests that they may. Section 355(j)(6)(A)(i)(III) gives FDA discretion to decide, for each listed drug, "whether in vitro or in vivo bioequivalence studies, or both such studies, are required for applications filed under this subsection...." The reference to *in vitro*, or chemical dissolution studies, suggests a showing of bioequivalence that could be wholly detached from the focus on "absorption," i.e. absorption *in vivo*, in Section 355(j)(7)(B). At oral argument, Schering claimed that such *in vitro* data is acceptable if and only if it is correlated to *in vivo* data. Transcript of Summary Judgment Hearing at 14. However, Schering also conceded that under the pre-existing regulations, bioequivalence could be demonstrated with *in vitro* data that was not correlated to *in vivo* data. *Id.;* 21 C.F.R. § 320.53(a)(5). This concession is significant because, as shown below, there is no evidence that Congress intended

to reject this regulatory regime, and some evidence that it intended to adopt it.

The legislative history of the 1984 amendments to the FDCA, which enacted the abbreviated application procedure set forth in Section 355(j), indicates that Congress generally meant to accept the pre-existing procedures for determining bioequivalence that were codified by the FDA in 1977. *See* 21 C.F.R. pt. 320. These rules governed abbreviated applications for the generic versions of listed drugs that had been approved by the FDA prior to 1962. The legislative history of the 1984 amendments states that:

> The purpose of Title I of the bill is to make available more low cost generic drugs by establishing a generic drug approval procedure for pioneer drugs first approved after 1962.... Title I of the bill generally extends the procedures used to approve generic copies of pre–62 drugs to post–62 drugs.

H.R.Rep. No. 857 (Part I), 98th Cong., 2d Sess. 14 (1984) U.S.Code Cong. & Admin.News 1984, p. 2647 ("House Report"). The last sentence of this passage evinces a clear intent to accept the FDA's then-existing methods of approving generic drug applications. Further, the legislative history's only reference to bioequivalence contains a direct citation to the 1977 regulations. *Id.* at 31, U.S.Code Cong. & Admin.News 1984, p. 2664.[7.]

Under the pre-existing regulatory regime, FDA had discretion to require and to accept any of a variety of showings, ranging from *in vivo* testing in humans to *in vitro* testing uncorrelated to human *in vivo* data, as sufficient to establish bioequi-

valence.[8] 21 C.F.R. § 320.53. While the 1984 amendments did make the bioequivalence requirement mandatory, *see* 21 U.S.C. § 355(j)(2)(A)(iv), there is nothing in the legislative history to indicate that Congress also intended to restrict FDA's historical discretion to decide how that requirement would be met. *Cf. Mead Johnson Pharmaceutical Group v. Bowen*, 838 F.2d 1332, 1336 (D.C.Cir.1988). Given the lack of any evidence that Congress intended to effect such a policy shift, and in light of the evidence that Congress did intend to allow existing FDA procedures when it enacted the 1984 amendments, the Court finds that the legislative history supports its conclusion that Section 355(j)(7)(B) was not intended to be the exclusive definition of bioequivalence.

■ Moreover, even if the language, structure, and legislative history of Section 355(j)(7)(B) all could be viewed as ambiguous or silent on this issue, the Court holds that the same absence of a Congressional intent to overhaul, rather than merely to refine and extend, a long-standing regulatory regime, would make the FDA's interpretation of the section a "reasonable" one. The Court likewise finds that the FDA's interpretation is consistent with the purposes of the FDCA. All the parties have expended a great deal of effort arguing that the dominant policy guiding construction of the statute is, on the one hand, to make more inexpensive generic drugs available to the public or, on the other hand, to ensure the safety of these drugs before they are substituted for their name-brand counterparts. However, the structure of the 1984 amendments to the FDCA makes

---

**7.** Schering argues that this specific reference to two sections of the 1977 regulations is indicative of Congress' intent to reject the remainder of the existing regulatory scheme. *E.g.*, Schering's Motion for Summary Judgment at 27–30. However, since other portions of the legislative history specifically refer to existing policies and regulations that the statute was intended to overturn, *e.g.*, House Report at 21, U.S.Code Cong. & Admin.News 1984, p. 2654, Schering's argument is at best inconclusive.

**8.** Even in those cases where FDA determined that *in vivo* testing would be required, the regulations outlined a spectrum of possible show-

ings, including, in order of preference: direct measures of drug absorption in blood or other bodily fluids; measurement of "an appropriate acute pharmacological effect," from which absorption could be inferred; and clinical trials to establish the safety and effectiveness of the drug. 21 C.F.R. §§ 320.57, 320.24 (1990). It bears noting that the third approach was not linked to measures of absorption, and thus was disfavored. Nevertheless, it was deemed "sufficiently accurate" for nonsystemic dosage forms such as the ones at issue in this case. *See* 21 C.F.R. § 320.24(c)(3) (1990).

evident, and other federal courts have held, that Congress had both objectives in mind. *E.g., Tri–Bio Laboratories, Inc. v. United States,* 836 F.2d 135, 139 (3rd Cir.1987) ("The 1984 Amendments ... reflect a statutory compromise of the competing concerns."). Thus, the issue of statutory interpretation presented by this case cannot be resolved merely by having the Court choose between these two policies, which are in tension with one another, and both of which were of central importance to Congress. Instead, judicial review of specific abbreviated drug approvals, along with the underlying finding of bioequivalence, will remain an available avenue to strike the balance that Congress seems to have intended.

In this regard, the Court wishes to emphasize the limitations of the present holding. The fact that Section 355(j)(7)(B) is not the exclusive definition of "bioequivalence" does not mean that the FDA is free to ignore bioequivalence altogether. First, as already discussed, the statute mandates that if an applicant makes one of the two showings enumerated in Section 355(j)(7)(B), the FDA has no choice but to find the generic drug "bioequivalent" to the listed drug. Second, Congress' enactment, at Section 355(j)(2)(A)(iv), of a mandatory bioequivalence requirement means that the FDA must make its bioequivalence finding under some reasonable and scientifically supported criterion, whether it chooses to do so on a case-by-case basis or through more general inferences about a category of drugs or dosage forms.[9] In other words, the FDA's prior discretion not to impose any bioequivalence requirement, *see* 21 C.F.R. § 320.52, no longer exists. However, since the Court has found that Congress did not intend to restrict the FDA's discretion to determine how the bioequivalence requirement is to be met, the defendants' motion for summary judgment

is granted, and Schering's motion for summary judgment is denied.

### B. *Preliminary Injunction Motion*

■ In strictest terms, it would not appear that the Court, having ruled on the merits of the summary judgment motions, needs to reach any issue not raised by those motions. Even after Copley's product had been approved, Schering did not amend its complaint, but chose simply to cite the Copley approval as proof that the main issue of statutory interpretation was ripe for decision. *See supra* note 3. Thus, there is a sense in which resolution of that legal issue on its merits is dispositive of the preliminary injunction motion as well. On the other hand, something further needs to be said about the latter motion for two reasons. First, Schering has suggested, both in its reply brief and at the preliminary injunction hearing, that the FDA has not made a sufficiently supported record finding of "bioequivalence" for the Copley drug even under a more expansive definition of that term. In light of this claim, it is at least arguable that Schering seeks to constructively amend its complaint to conform to new facts presently before the Court, scanty though those facts may be.

The second reason that the preliminary injunction motion must be addressed at greater length is that Schering, by intimating that the Copley drug potentially is harmful to the public, is seeking to raise the precise safety issue that was of concern to Congress. Procedural barriers notwithstanding, there can be little doubt that this Court would have a basis for enjoining shipment of the Copley drug if, for instance, it could be shown that the FDA likely had violated the FDCA in approving it and there were some significant evidence that the drug posed a health hazard ignored by the agency. Under the circumstances, it is prudent to discuss the merits

---

**9.** Even under the 1977 regulations, FDA was required to find bioequivalence by "the most accurate, sensitive, and reproducible approach available." 21 C.F.R. § 320.24(b). In the case of drugs for which rate and extent of absorption are easily measured, that approach presumably will follow Section 355(j)(7)(B) closely. Thus, although the Court has found that Congress did

not intend the two showings enumerated in Section 355(j)(7)(B) to play a larger role in the statutory scheme than they did in the regulatory scheme, the very presence of Section 355(j)(7)(B) in the statute also suggests that Congress did not intend for them to play a smaller role.

of Schering's claims directed to the Copley product itself. For the reasons stated below, the Court finds that preliminary injunctive relief is not warranted on the present record.

When deciding a motion for a preliminary injunction, the Court must consider four criteria: (1) whether plaintiff is likely to prevail on the merits; (2) whether plaintiff has shown irreparable injury absent interim relief; (3) whether injunctive relief would significantly harm other interested parties; and (4) whether the public interest would be served by granting or denying preliminary relief. *Washington Metropolitan Area Transit Commission v. Holiday Tours*, 559 F.2d 841 (D.C.Cir.1977). The greatest difficulty with Schering's impromptu suggestion that it is entitled to preliminary relief even under a broad application of the statute is that it has not demonstrated a likelihood of success on the merits of a future factual challenge to the FDA's determination that the Copley drug is bioequivalent to the Schering pioneer drug.

Although Schering claims its challenge is "limited in scope" to FDA's asserted departure from what Schering believes to be the statutory definition of bioequivalence, Reply Memorandum in Support of Motion for Preliminary Injunction at 6, Schering also suggests that, in any event, there is no adequate explanation underlying the FDA's finding or inference of bioequivalence. *Id.* at 8. However, the agency did purport to make such a finding or inference that the Copley drug is bioequivalent to the Schering drug, *see* Defendant's Opposition to Motion for Preliminary Injunction, Exhibit 2(c) at 1, and the FDA's affidavit—which is pertinent at the preliminary injunction stage—premises this determination on standards set forth by the 1977 regulations for drugs "administered by inhalation as a gas or vapor." *Id.*, Exhibit 2, ¶ 9; 21 C.F.R. § 320.22(b)(4). Apart from its statutory challenge, Schering has not yet offered an adequate basis for challenging the

support for or the application of that regulation in this case.

Equally significant to the question of preliminary relief is Schering's failure to offer any affirmative evidence that there is reason for suspecting that the Copley drug would pose a threat to public safety. While much has been made about the general hazards of permitting non-bioequivalent generic drugs to be substituted for pioneer drugs, there is nothing before the Court, in the partial "administrative record" [10] or elsewhere, to suggest that the drug in question is such a drug and would have immediate harmful effects on the public. At the same time, the FDA's affidavit does describe the extensive review conducted by the FDA with the safety issue in mind. Here again, acknowledging the undoubted importance of the Congressional mandate for safe generic drugs, the Court cannot find on the present record that Schering would be likely to succeed on the merits of a future factual challenge to the Copley approval.

A preliminary injunction nonetheless might be warranted if the Court could find that Schering had "made a substantial case on the merits," and that the equities of the case "strongly favor interim relief." *Holiday Tours*, 559 F.2d at 843. However, as discussed, there is no evidence that the public interest would be served by issuance of an injunction, while delay in the marketing of Copley's drug could easily be against the public interest in reduced prices. *See Mead Johnson Pharmaceutical Group v. Bowen*, 655 F.Supp. 53, 56 (D.D.C.1986), *aff'd*, 838 F.2d 1332 (D.C.Cir.1988). Further, the Court finds that the equitable balance of harms between the parties is inconclusive at best. Schering argues that it will suffer great economic losses due to competition from the Copley product. This claim is speculative as to amount, *see id.* at 56, and in any event falls short of showing the immediate irreparable harm necessary

---

**10.** The FDA does not yet purport to have assembled the full administrative record relating to the Copley approval, and concedes that a future

challenge by Schering based on that record would be permissible. *See* Defendant's Opposition to Motion for Preliminary Injunction at 5.

to justify emergency injunctive relief.[11] Similarly, while Copley makes a credible showing that its economic interests could be irreparably damaged by an injunction, it is hard to accord great weight to this outcome where the facts suggest that Copley willingly assumed this risk when deciding to bring its product to market in the face of Schering's pending lawsuit. In sum, the Court concludes that the equities of the case do not warrant injunctive relief at this time.

Since the Court has ruled on the merits of Schering's original complaint, and concluded that there presently is no basis for the issuance of emergency injunctive relief, Schering's complaint will be dismissed. The dismissal will permit Schering to seek immediate appellate review on the legal issue that both it and the FDA agree to be ripe. At the same time, this dismissal is without prejudice to any future suit that Schering chooses to bring for the purpose of challenging the Copley approval itself on a full administrative record.[12]

### III. CONCLUSION

In accordance with this Memorandum Opinion, an Order will be entered this date, granting defendants' motion for summary judgment and dismissing this case, without prejudice to Schering's right to file a new action seeking judicial review of the Copley approval.

---

11. Schering additionally claims that it would be harmed by the release of its safety and effectiveness data if the Copley approval is not enjoined. However, since Schering is entitled to independent judicial review of any FDA decision to release this data, it is not in danger of immediate irreparable harm from a possible disclosure. See Mead Johnson, 655 F.Supp. at 56.

12. Alternatively, since Copley has a related action, Copley Pharmaceuticals, Inc. v. Schering Corp., Civil Action No. 91–3189, pending in this Court, the parties may elect to use this action as the vehicle for obtaining judicial review of the Copley approval.