**BRISTOL–MYERS SQUIBB
COMPANY, Plaintiff,**

v.

**Donna E. SHALALA, et. al., Defendants.**

**Civil A. No. 96–399 RMU.**

United States District Court,
District of Columbia.

March 25, 1996.

Robert J. Brookhiser, Howrey & Simon, Washington, D.C., for Plaintiff.

Gerald C. Kell, Office of Consumer Litigation, Department of Justice, Washington, D.C., for Defendants.

## ORDER

URBINA, District Judge.

### Denying Plaintiff's Motion for a Preliminary Injunction

This matter comes before the court upon plaintiff's motion for a preliminary injunc-

tion; defendants' opposition; defendant/intervenor's opposition and plaintiff's reply.[1] The court concludes that plaintiff's motion shall be denied because plaintiff has failed to demonstrate that it has a substantial likelihood of success on the merits; that it will be irreparably harmed; that the balance of harms favors the issuance of an injunction; or that the public interest will be furthered if the court were to grant injunctive relief.

## I. Background

On March 1, 1996, Bristol–Myers Squibb (Bristol) filed the above-captioned action challenging the Food and Drug Administration's (FDA) decision to approve, for marketing in the United States, a drug called Prevalite™. This product is manufactured by Upsher–Smith (Upsher) and is a generic competitor to Bristol's cholesterol lowering product Questran®.[2] Plaintiff requests that this court, in effect, set aside the FDA's decision to approve Prevalite™, and thereby stop the marketing of the competitor product. Bristol also requests that the court order the agency to rescind a document entitled "Interim Guidance Cholestyramine Powder *In Vitro* Bioequivalence" (Guidance); to rescind or refrain from listing Prevalite™ as bioequivalent to Questran® in the FDA's publication "Approved Drug Products With Therapeutic Equivalence Evaluations;" also known as the Orange Book; and to enjoin the FDA from approving an ANDA for a cholestyramine product based solely upon *in vitro* testing unless the *in vitro* testing is correlated with *in vivo* testing data.[3] On March 6, 1996, the court denied plaintiff's application for a temporary restraining order which sought the same relief as presently requested.

The Federal Food Drug & Cosmetic Act (FD & C Act), 21 U.S.C. § 301–392, sets forth the requirements for FDA approval of drug products. Generally, in order for a drug to be marketed in the United States, it must first be approved by the FDA. 21 U.S.C. § 355(a). The manufacturer of the original drug product, referred to as the pioneer drug, must establish that the drug is both safe and effective to secure FDA approval. 21 U.S.C. § 355(b). The preparation of the initial application requires extensive reports and tests. *Id.* The initial application submitted for FDA approval is referred to as a new drug application (NDA). Manufacturers of generic versions of previously approved pioneer drug products are subjected to less rigorous standards.

Generic manufacturers may submit to the FDA an abbreviated new drug application (ANDA), which must contain "information to show that the [generic] drug is bioequivalent to the [pioneer] drug." 21 U.S.C. § 355(j)(2)(A)(iv). An applicant must show that the rate and extent of absorption of the generic drug does not differ significantly from the rate and extent of absorption of the pioneer drug. 21 U.S.C. § 355(j)(2)(A)(iv).[4] An applicant can demonstrate bioequivalence by "*in vitro* or *in vivo* bioequivalence studies, or both such studies." 21 U.S.C. § 355(j)(6)(A)(i)(III).[5] However, it is pursu-

---

1. On March 8, 1996, the court granted Upsher's unopposed motion to intervene as a defendant in this case.

2. Bristol also manufactures Questran® Light; which contains aspartame, also known as Nutrasweet™.

3. In the Guidance, the FDA expressed its view that *in vivo* studies are not necessary to establish the bioequivalence of cholestyramine resin formulations, the active ingredient in Questran®.

4. "Bioequivalence means the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed

study." 21 C.F.R. § 320.1(e). In ANDA, an applicant may establish bioequivalence by demonstrating that the generic drug has the same bioavailability as the pioneer drug. 21 U.S.C. § 355(j)(7)(A). Bioavailability means the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug and becomes available at the site of drug action. *Id.*

5. Studies that are conducted in laboratory test tubes and that do not measure absorption are called *in vitro* studies. *Schering Corp. v. FDA*, 51 F.3d 390, 398 n 11 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995). Studies that are conducted in the human body are called *in vivo* studies. *Id.*

ant to agency regulations that one determines when *in vitro* testing may be utilized in lieu of *in vivo*. If bioequivalence is established for a generic drug, it is given an "AB" rating in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (the Orange Book); which is relied upon by pharmacists in filling prescriptions. The FDA's AB rating means that the generic drug is considered therapeutically bioequivalent to the pioneer drug.

Bristol currently markets a cholestyramine drug product Questran®, pursuant to FDA approval. Cholestyramine is the active ingredient in Questran®. This drug is administered to patients in order to lower their cholesterol levels. On July 15, 1993, the Division of Bioequivalence in the Office of Generic Drugs of FDA's Center for Drug Evaluation and Research issued the Guidance. The Guidance expresses the FDA's view that "*in vivo* studies are not necessary to document the bioequivalence of cholestyramine ..." The Guidance set forth the kinds of *in vitro* studies and methods that the FDA would accept to establish bioequivalence in ANDAs for generic cholestyramine.

On August 18, 1993, Bristol submitted to the FDA a citizen petition (Petition) challenging the Guidance and the protocol it established for the approval of generic cholestyramine drug products. Bristol asserts that the FDA has inexplicably changed its bioequivalence policy from one that required both *in vivo* and *in vitro* testing to demonstrate the bioequivalence of new forms of cholestyramine, to one which only required *in vitro* testing. Bristol takes issue with the FDA's position that *in vivo* studies are not necessary to establish the bioequivalence of cholestyramine drug products. The petition thus requests that the FDA rescind the Guidance and refrain from approving any application for cholestyramine products in which the applicant was allowed to demonstrate bioequivalence through *in vitro* tests. In its Petition, Bristol sought to show that there was no scientific evidence to establish a correlation between *in vivo* and *in vitro* tests for cholestyramine. The FDA, pursuant to its regulations dealing with such petitions, provided Bristol with an interim response. *See*

21 C.F.R. § 320.22(d)(3); 21 C.F.R. § 10.30(e)(2). However, the FDA itself acknowledges that this initial response was approximately twenty-two days late. A final response was finally submitted with the defendants' opposition to Bristol's motion for a preliminary injunction.

On February 22, 1996, the FDA approved an ANDA for Prevalite™. The agency concluded that Prevalite™ is bioequivalent to Bristol's Questran® product based on *in vitro* studies of the kind specified in the Guidance.

## II. Analysis

In order to succeed on a motion for a preliminary injunction, a movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) that the public interest favors entry of a preliminary injunction. *WMATC v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977); *Sea Containers, Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C.Cir. 1989). A preliminary injunction is not granted as a matter of right. *Eli Lilly and Co. v. Premo Pharmaceutical Labs.*, 630 F.2d 120, 136 (3d Cir.1980), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). Injunctive relief is an extraordinary remedy and must be sparingly granted. *Dorfmann v. Boozer*, 414 F.2d 1168 (D.C.Cir.1969).

A district court is to balance the four factors. *Grigsby Brandford & Co., Inc. v. U.S.*, 869 F.Supp. 984, 1003 (D.D.C.1994). Consequently, although a "particularly strong likelihood of success on the merits" may entitle a movant to relief upon "a relatively slight showing of irreparable injury," some showing of irreparable injury is always required, "since 'the basis for injunctive relief in the federal courts has always been irreparable harm.'" *CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C.Cir.1995) (*quoting Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 951–52, 39 L.Ed.2d 166 (1974)). Likewise, a court may accept a showing that the movant has a "substantial case on the merits" instead of the probability of success on the merits that is ordinarily required, but

only when all of "the other three factors strongly favor interim relief." *Holiday Tours, Inc.*, 559 F.2d at 843.

## A. Likelihood of Success on the Merits

### 1. Standard of Review

■ Bristol's attack on FDA's decision proceeds under the Administrative Procedures Act, 5 U.S.C. § 706. A court shall not set aside an agency action, findings, or conclusions, unless the same are found by the court "to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ..." 5 U.S.C. § 706(2)(A). Under this standard, "there is a presumption in favor of the validity of administrative action." *Ethicon, Inc. v. FDA*, 762 F.Supp. 382, 386 (D.D.C.1991). A reviewing court "must consider whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). Moreover, under this narrow scope of review, "[t]he court is not empowered to substitute its judgment for that of the agency." *Id.* There is a presumption in favor of the validity of the administrative action. *Ethicon, Inc. v. FDA*, 762 F.Supp. 382 (D.D.C.1991).

■ The FDA is to be accorded deference when it is evaluating scientific data within its technical expertise. *FPC v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 643–44, 30 L.Ed.2d 600 (1972); *International Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C.Cir.1992); *Tri–Bio Laboratories, Inc. v. United States*, 836 F.2d 135, 142 (3d Cir.1987), *cert. denied*, 488 U.S. 818, 109 S.Ct. 57, 102 L.Ed.2d 35 (1988). Moreover, because this action implicates, in part, an interpretation by the agency of its own regulations, the court must be especially deferential. *United States v. Rutherford*, 442 U.S. 544, 553, 99 S.Ct. 2470, 2475–76, 61 L.Ed.2d 68 (1979). Nonetheless, deference is not abdication. The court must find that the relevant factors upon which the decision is based are supported by some evidence. *Ritter Transportation, Inc. v. ICC*, 684 F.2d 86, 88 (D.C.Cir.1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983). Last-

ly, the court must review the administrative record as assembled by the FDA; it does not pursue its own fact finding. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

### 2. Bioequivalence

■ An applicant for an abbreviated approval of a generic drug must provide "information to show that the new drug is the bioequivalent to the listed drug." 21 U.S.C. § 355(j)(2)(A)(iv). The bioequivalence requirement "acts as a market entry restriction to ensure that generic drugs will be as safe and effective as their pioneer drug counterparts." *Schering Corp. v. Food and Drug Admin.*, 51 F.3d 390, 396 (3rd Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995). Presently, the parties differ on the basis pursuant to which the FDA could accept *in vitro* testing so that Upsher could establish the bioequivalence of Prevalite™ and Questran®. Plaintiff asserts that only 21 C.F.R. § 320.22(d)(3) can provide the basis for demonstrating the bioequivalence of the two drug products at issue in this case. This regulation provides that bioequivalence is shown when "the drug product is, on the basis of scientific evidence submitted in the application, shown to meet an *in vitro* test that has been correlated with *in vivo* data." 21 C.F.R. § 320.22(d)(3). Thus, Bristol maintains that *in vitro* testing must be correlated with *in vivo* testing data in order for two cholestyramine drug products to be found bioequivalent. Bristol also takes issue with the FDA's purported decision to change its policy concerning its prior practice of requiring both *in vivo* and *in vitro* testing to establish the bioequivalence of cholestyramine drug products.

The FDA, on the other hand, relies on different regulations for its decision to allow only *in vitro* testing to establish the bioequivalence of Prevalite™ and Questran®. Specifically, the FDA relies on a regulation which provides that the "FDA, for good cause, may waive a requirement for the submission of evidence of *in vivo* bioavailability if waiver is compatible with the public health." 21 C.F.R. § 320.22(e). Bristol, however, asserts that the FDA had no good

cause to waive the *in vitro* requirement; nor did the FDA have a basis to conclude that whatever good cause might have existed (although Bristol argues none was present) was compatible with the public interest. Bristol contends that the FDA did not offer "any reasoned explanation" why it was waiving the *in vitro* requirement. To buttress its case, Bristol chronicles the FDA's past practice of requiring either *in vivo* evidence of the bioequivalence of cholestyramine drug products or evidence of a correlation between *in vitro* and *in vivo* tests used to establish bioequivalence.

A variety of other agency regulations pertain to bioequivalence and under what circumstances the FDA may conclude that a showing of bioequivalence has been made. The FDA avers that in addition to 21 C.F.R. § 320.22(e), there are other regulations which provide independent bases for its decision. For instance, Section 320.24 provides that to determine whether bioequivalence has been established, the FDA may use any approach it deems adequate. 21 C.F.R. § 320.24(b)(6). The FDA also relies on certain specified "[c]riteria and evidence to assess actual or potential bioequivalence problems" for guidance on factors used to determine whether *in vivo* and/or *in vitro* testing is necessary to establish bioequivalence. 21 C.F.R. § 320.33. In addition, 21 C.F.R. § 320.25(b)(5) lists "currently available *in vitro* tests acceptable to FDA" as a form of evidence available to establish bioequivalence. Consequently, there is no reason for the court to conclude that 21 C.F.R. § 320.22(d)(3) is the only basis pursuant to which the FDA could approve Prevalite™.

Section 355(j)(6)(A)(i)(III), affirmatively vests the FDA with the discretion to determine whether *in vitro* or *in vivo* bioequivalence studies, or both, are required for the approval of generic drugs under the abbreviated application process.[6] 21 U.S.C. § 355; *see also Schering Corp.*, 51 F.3d at 398. "Vesting the FDA with discretion to authorize *in vitro* tests to establish bioequivalence supports" the FDA's decision to approve a generic drug such as Prevalite™, without requiring absorption testing. *See Id.*, at 398. Moreover, although the Hatch–Waxman Amendments to the FFD & C Act, also known as Title I of the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 98 Stat. 1585 (1984), mandate a showing of bioequivalence for approval of a generic drug, "there is no evidence that Congress intended to limit the discretion of the FDA in determining when drugs were bioequivalent for purposes of ANDA approval." *Id.* at 399. To the contrary, the expressed desire of Congress, through the 1984 amendments, was that the FDA retain "its historically wide discretion in defining showings of 'bioequivalence.'" *Schering Corp. v. Sullivan*, 782 F.Supp. 645, 648 (D.D.C.1992), *vacated as moot sub nom, Schering Corp. v. Shalala*, 995 F.2d 1103 (D.C.Cir.1993). "Congress did not intend to restrict the FDA's discretion to determine how the bioequivalence requirement is to be met ..." *Id.* at 651; *see also Fisons Corp. v. Shalala*, 860 F.Supp. 859, 865 (D.D.C. 1994). Furthermore, the FDA has had a long practice of accepting alternative showings of bioequivalence and there is no evidence that Congress has intended to abridge that practice. *Id.* at 648.

Presently, the FDA is requiring a showing of bioequivalence for the Prevalite™ and Questran® drug products; however as part of its expertise and exercise of discretion, it may waive certain testing procedures. As a result, Bristol has not demonstrated that it has a substantial likelihood of succeeding on its claim that the FDA decision to require only *in vitro* testing to demonstrate bioequivalence is arbitrary and capricious.

Furthermore, Bristol is silent with respect to the FDA's argument that none of the examples the former uses for its position vis-a-vis the FDA's past practice, deal with an ANDA for a generic cholestyramine powder product, which is the form of cholestyramine at issue in this case. In addition, the FDA's position regarding nonsystematically ab-

---

6. The 1984 amendment to Section 355 changed the method by which the FDA approves generic drugs. Through an ANDA, a generic drug manufacturer may rely on existing information in or-

der to meet the safety and efficacy requirements. *Glaxo, Inc. v. Heckler*, 623 F.Supp. 69, 72 (D.C.N.C.1985).

sorbed drugs like cholestyramine was made clear in 1992. The FDA stated that ANDA applications for such drugs are not required "to submit evidence of *in vivo* bioavailability or *in vivo* bioequivalence in every case." *Abbreviated New Drug Application Regulations,* 57 Fed.Reg. 17,950, at 17,975 (1992) (preamble to final rules).[7]

As the FDA points out, the cases relied upon by Bristol dealt with agency statutory interpretations.[8] In contrast, the present case involves the agency's scientific judgments concerning what testing methods are needed to establish bioequivalence. *See Solite Corp. v. EPA,* 952 F.2d 473, 490 (D.C.Cir. 1991) (according deference to the agency with respect to the testing methodology used). The administrative record as presently constituted demonstrates that the FDA made a comprehensive review of the scientific testing performed with respect to cholestyramine powders, such as Prevalite™, and concluded that *in vitro* studies would be sufficient to establish bioequivalence.

Moreover, bioequivalence may be established with *in vitro* data that is not correlated with *in vivo* data. *Sullivan,* 782 F.Supp. at 649–650. Bristol does not point to any legislative history that would require the FDA to adhere to a specific testing methodology; and Congress' silence on this issue further buttresses the FDA's position that its regulations and interpretations thereof are consistent with legislative intent. *Id.* The FDA has had a continuing practice of allowing *in vivo* testing or *in vitro* testing uncorrelated to *in vivo* data to establish bioequivalence. *Id.* There is nothing before the court which would lead it to conclude that this latitude is limited to only certain drug products. "While the 1984 amendments did make the bioequivalence requirement mandatory ... there is nothing in the legislative history to indicate that Congress intended to restrict FDA's historical discretion to decide

how that requirement would be met." *Id.* Accordingly, Bristol has not demonstrated a substantial likelihood of success on the merits on its claim that the FDA exceeded its authority by permitting Upsher to establish the bioequivalence of Prevalite™ and Questran® through *in vitro* testing that was not correlated with *in vivo* testing data.

**3. Scientific Basis for Agency's Decision**

■■■■■ Although the FDA has wide discretion to determine how the bioequivalence requirement is met, its discretion must be based on a "reasonable and scientifically supported criterion, whether it chooses to do so on a case-by-case basis or through more general inferences about a category of drugs ..." *Sullivan,* 782 F.Supp. at 651. The FDA properly states that it has the discretion to accept *in vitro* bioquivalence data for particular drugs on a case-by-case basis. In this case, the FDA states that the scientific basis for its decision to allow *in vitro* testing to establish the bioequivalence of cholestyramine products, as articulated in the Guidance, is sufficient to establish the reasonableness of the agency's decision. In addition, the FDA submits its Response to Bristol's Citizen Petition to further support the legality of its decision. The FDA maintains that a reasonable scientific basis exists upon which to conclude that Prevalite™ is bioequivalent to Questran®. Conversely, Bristol asserts that the FDA's decision to allow *in vitro* testing to establish the bioequivalence of cholestyramine drug products was arbitrary and capricious because it was unsupported by reliable scientific evidence.

At this juncture and based on the administrative record before the court, the court concludes that the FDA through the Guidance and its Response to Bristol's Citizen Petition has presented a reasonable scientific basis for its decision to allow *in vitro* testing data to establish the bioequivalence of the cholestyramine used in Questran® and Pre-

---

7. Moreover, to the extent the FDA's decision constitutes an adjustment of prior practice, for purposes of the present motion, the FDA has provided the court with a reasoned analysis justifying that adjustment. *See Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 853 (D.C.Cir. 1979), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1981).

8. *See Greater Boston Television Corp. v. FCC,* 444 F.2d 841 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971); *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), *Watt v. Alaska,* 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981); and *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

valite™. In the Guidance, the FDA's Division of Bioequivalence concluded that *in vivo* studies are not necessary to document the bioequivalence of cholestyramine resin formulations. This judgment is based on over seven years of laboratory research and technical analysis by FDA scientists and consultants. The Guidance sets forth, in considerable detail, the kinds of *in vitro* studies and testing methods that the FDA finds acceptable to establish the bioequivalence of cholestyramine drug products. Therefore, the scientific basis for the agency's determination is that it found *in vitro* studies sufficient to establish bioequivalence and consequently it determined that the submission of the same would suffice. Moreover, the administrative record establishes, contrary to Bristol's intimation, that the FDA's judgment, as reflected in the Guidance, was based on evidence and analysis the agency used at the time its decision was made; not post hoc rationalizations for the FDA's determination.[9] The agency has submitted internal documents dating back to April 1989 which chronicle the history of its decision-making process which resulted in its decision, including a summary of the Prevalite approval. In that document the FDA concludes that Prevalite is bioequivalent to Questran® because the generic firm conducted the requisite tests which, in the FDA's view, yielded satisfactory results. The administrative record, at this juncture, establishes the scientific bases upon which the agency relied, including the raw data utilized.

In the Response, the FDA further articulates a rational basis upon which it relied in reaching its decision. It based its decision on "facts developed through its evaluation of information contained in NDA's and ANDA's, independent scientific research, and on experiments conducted by the Office of Generic Drugs, Center for Drug Evaluation and Research. FDA's decision was also, to a lesser degree, based on published literature." Response to Citizen Petition at 2. Although the FDA could have more fully responded at an earlier juncture to Bristol's Petition, Bristol has not pointed to and the court has found nothing in the FD & C Act that would require the FDA to first respond to a Petition before approving an ANDA.

Moreover, the FDA responds to all the substantive challenges raised by Bristol regarding its decision and provides an explanation as to its decision to allow *in vitro* studies alone to establish bioequivalence. *Compare A.L. Pharma, Inc. v. Shalala,* 62 F.3d 1484, 1490 (D.C.Cir.1995) (directing the FDA to provide an adequate explanation of its determination that a particular study established bioequivalency). The agency, in its response, systematically addresses Bristol's concerns.[10] For instance, the agency states that its decision was based on experiments it conducted which showed that *in vitro* studies could establish the bioequivalence of cholestyramine powder products. The agency specifies what those experiments entailed. The agency also addresses the studies relied upon by Bristol in challenging the FDA's decision. It explains why those studies do not support Bristol's position. Additionally, the FDA outlines its reasons for concluding that the *in vitro* tests specified in the Guidance are scientifically sound.

The FDA has, at this point, examined the relevant data and "articulate[d] a satisfactory explanation for its action including 'a rational connection between the facts found and the

---

9. Unlike *KN Energy, Inc. v. FERC,* 968 F.2d 1295 (D.C.Cir.1992), upon which Bristol relies, the FDA in this case has offered a basis for its decision to only require *in vitro* studies to establish bioequivalence. In *KN Energy,* which involved a challenge to an agency order, unlike here, the Federal Energy Regulatory Commission attempted to explain its action for the first time through its brief filed on appeal. The administrative record apparently did not, in that case, establish a basis for the agency's decision. *Id.* at 1303. In addition, the Commission did not answer a substantive challenge to its order. Conversely, in this case the administrative record, as developed by internal agency documents, establishes a reasoned basis for the agency's decision. In addition, the agency here responds to all substantive attacks made against its decision by Bristol.

10. Although apparently not provided to Bristol at the time it was drafted, the agency prepared a memorandum dated January 4, 1994 systematically addressing the arguments raised by Bristol in its Petition. *See* Defendant's Opposition, attachment S. Those comments were incorporated into the Response by the defendants.

choice made.'" *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). The parties' dispute is fundamentally a scientific one over which the court lacks expertise and over which the FDA is the expert. The court therefore cannot conclude, at this stage, that the agency's decision was arbitrary and capricious. *See Zotos Intern., Inc. v. Young*, 830 F.2d 350, 353 (D.C.Cir.1987) (stating that "given [the court's] hopeless ignorance of the subject matter, it would be most difficult for [it] to find the FDA's rejection of [plaintiff's scientifically based] arguments arbitrary") (internal citations omitted). The court cannot presently conclude that the agency has not evaluated the relevant factors or that it has made a clear error of judgment. As other courts have observed, "[t]he FDA is the agency charged with implementing the Food, Drug and Cosmetic Act as amended. Its judgments as to what is required to ascertain the safety and efficacy of drugs fall squarely within the ambit of the FDA's expertise and merit deference from" the courts. *Schering Corp.*, 51 F.3d at 399.

## B. Irreparable Harm

■ "Irreparability of injury is a very high standard." *American Coastal Line Joint Venture, Inc. v. United States Lines, Inc.*, 580 F.Supp. 932, 936 (D.D.C.1983). Bristol's irreparable harm argument is premised on the alleged economic injury it will suffer as a result of the competition that will be engendered by Prevalite™, as well as any possible injury to its reputation that could result if a health risk ensues from Prevalite™ approval, which in turn might be imputed to Bristol by the using public. The first prong of the argument is insufficient to establish irreparable harm and the second is based solely upon conjecture.[11] Bristol's

sales in 1995 reached a total of $13.767 billion. *See* "US Company 1995 Results," SCRIP No. 2099, Feb. 2, 1996 at 8. According to Bristol, in 1995 net sales of Questran® and Questran® Light were approximately $97 million. Sales of these two products thus accounted for only .7% of Bristol's total sales. "It is well settled that economic loss does not, in and of itself, constitute irreparable harm ... 'The key word in this consideration is irreparable. Mere injuries, however, substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.'" *Wisconsin Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir. 1985) (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir. 1958)).

Moreover, demanding scrutiny must be applied to claims of irreparable injury. For instance, in *CityFed Fin. Corp. v. OTS*, 58 F.3d 738 (D.C.Cir.1995), the Office of Thrift Supervision froze the assets of CityFed. CityFed sought to enjoin enforcement of that order, relying on affidavits from its officers stating that it would be driven into bankruptcy absent a stay. *Id.* at 746–747. The Court of Appeals, based on its own analysis of the order and CityFed's financial position, rejected CityFed's claim because the order provided a narrow escape valve that permitted the bank to apply for "hardship" relief from the order. *Id.* Thus, because the bank had a means by which it could keep itself from going into bankruptcy, the Court concluded that irreparable injury had not been established.

Presently, Bristol will undoubtably survive as a going business concern absent injunctive relief. Further, its ability to survive is not theoretical; its total sales picture will not be greatly affected by any loss of market share that will result from Prevalite's™ competi-

---

11. Bristol relies, for the most part, on two cases to establish irreparable harm. That reliance, is however, misplaced. In *Conax Florida Corp. v. United States*, 625 F.Supp. 1324 (D.D.C.1985), the court found irreparable harm because the defendant was threatening to disclose plaintiff's trade secrets and as a result plaintiff's financial health was "critically threatened," and "possibly [the] existence" of plaintiff, as well. *Id.* at 1327. Such is presently not the case. In *Multi–Channel TV Cable v. Charlottesville Qu. Cable*, 22 F.3d

546 (4th Cir.1993), the court granted an injunction after finding that the movant had met all four prongs of the preliminary injunction standard, unlike here. In addition, the effect of the injunction was to restore competition between cable companies that had existed prior to the defendants allegedly wrongful actions. Presently, the effect of the injunction would be to disrupt competitive forces; without a showing by Bristol that the other factors warrant the granting of injunctive relief.

tion—a loss of less than 1 percent of total sales is not irreparable harm. Moreover, Bristol's claim that it will loose between 50 and 70 percent of its market share of the cholestyramine market, is supported by mere speculation concerning the encroachment of Prevalite™ into its market share. *See Mead Johnson Pharmaceutical Group v. Bowen,* 655 F.Supp. 53 (D.D.C.1986) (holding that plaintiff's contention that if an ANDA was approved it would loose twenty to thirty percent of its market share was inadequate to establish irreparable harm). Additionally, Bristol's argument that if it prevails on the merits it will be unable to recover damages is inconsequential. *See General Textile Printing v. Expromtorg Intern.,* 862 F.Supp. 1070, 1075 (S.D.N.Y.1994) (denying an injunctive request which was based on a defendant's potential inability to satisfy a money judgement). If it ultimately prevails on the merits, Bristol's total sales will be insignificantly affected over the duration of the litigation. Even assuming that Bristol's projections are correct, as a result of Prevalite's competition, the effect of Bristol's total sales would be minuscule.[12] "The mere existence of competition is not irreparable harm, in the absence of substantiation of severe economic impact." *Holiday Tours,* 559 F.2d at 843 n. 3.

Similarly, Bristol's claim that its reputation will suffer if there is any adverse health effect that ensues from the use of Prevalite™ is insufficient to establish the requisite harm. There is nothing before the court which would lead it to conclude that Prevalite™ will cause any harmful health effects. *See Sullivan,* 782 F.Supp. at 652. Finally, the court notes that if the injunction is granted, Bristol would substantially receive the ultimate relief it requests, before there has been a trial of the issues and on a record which fails to show Bristol's substantial likelihood of succeeding on the merits. *See Triebwasser &*

*Katz v. AT & T,* 535 F.2d 1356, 1360 (2d Cir.1976).

### C. Balance of Harms

Presently, the balance of harms decidedly weighs in favor of denying a preliminary injunction. The resulting harm to Upsher would be significantly greater than the harm that will be visited upon Bristol if its request for injunctive relief is denied. The approval of Prevalite™ has entailed a significant investment of economic and other resources on the part of Upsher. Upsher has endured a seven year process to obtain FDA approval and has satisfied the FDA's testing protocol and established, to the FDA's satisfaction, the bioequivalence of Prevalite™ and Questran®. Moreover, the effect of an injunction on Upsher would be dramatically greater than the harm to Bristol, considering that its total sales in 1995 amounted to $33 million and both companies expect the sale of Upsher's Prevalite™ to be upwards of $20 million or more in the first year on the market.

### D. Public Interest

Bristol has not established that the public interest will be better served if an injunction is issued by the court. The Hatch–Waxman Amendments to the FFD & C Act aimed to increase competition in the drug industry by creating an administrative regime pursuant to which the approval of generic drugs would be facilitated. *Mead Johnson Pharmaceutical Group v. Bowen,* 838 F.2d 1332, 1333 (D.C.Cir.1988). This new, abbreviated process was encompassed in the ANDA application process. This process has made the manufacture of generic drugs more practical. *Id.* To balance the interests of generic drug manufacturers and those of pioneer drug manufacturers, Congress provided the latter with varying peri-

---

**12.** Bristol does not dispute that its total sales in 1995 amounted to approximately $13.767 billion. According to Bristol its sales of Questran® and Questran® Light were approximately 97 million and thus accounted for a mere .7 percent of Bristol's total sales. Bristol contends, without support, that it will suffer a fifty to seventy percent reduction in its sales of Questran® and Questran® Light as a result of Prevalite's™ competition. Bristol estimates that in the ab-

sence of competition from Prevalite™, its 1996 sales of Questran® and Questran® Light would approximate $80 million. Even accepting Bristol's projections as true, the effect of Prevalite™'s competition on Bristol's total sales would amount to an approximate reduction of less than .5 percent in total sales this coming year, unless there is a dramatic change in Bristol's total sales. That kind of economic effect can hardly constitute irreparable injury.

ods of exclusivity prior to FDA approval of a competing generic drug. *Id.* Presently, Bristol has benefitted from the period of exclusivity to which it was entitled. The using public will therefore now benefit from increased competition and the concomitant decrease in cholestyramine drug products.[13] A delay in the approval, without the showing of a substantial likelihood on the merits would not further the public interest. *See Sullivan,* 782 F.Supp. at 652.

Lastly, there is no reason for the court to conclude that there may exist a possible health risk posed by the approval of Prevalite™. *See id.* at 652. Bristol maintains that because Prevalite™ contains aspartame, also know as Nutrasweet™, a potential public health risk exists. This is so because some individuals do not metabolize phenylalanine, a component of aspartame. However, this danger is negated by the fact that Prevalite™, as does Questran® Light, contains a clear warning label specifying that the drug product contains phenylalanine. The product box also states that it contains aspartame. A treating physician who has a patient who could not metabolize phenylalanine would be on notice, as with other drugs which may have an adverse effect on his or her patients, not to prescribe the drug to phenylketonurics. Bristol further argues that because in certain situations a pharmacist would be required to substitute the generic drug Prevalite™ for Questran®, a potential health risks exists. However, in such situations physicians would presumably require that a particular brand be dispensed; as the FDA has counseled them to do. *See* FDA, *Approved Drug Products with Therapeutic Evaluations,* at viii.[14] Finally, the FDA has, in its scientific judgment, concluded that Prevalite™ is safe for its intended use and responded to each of Bristol's concerns relating to the public health.

Accordingly, since Bristol has failed to establish that it is entitled to injunctive relief, it is this day 25 of March 1996,

**ORDERED** that plaintiff's motion for a preliminary injunction be and is hereby **denied.**

**SO ORDERED.**

---

**13.** Upsher is currently selling Prevalite™ at a price that is approximately forty seven percent below what Bristol charges for Questran®.

**14.** Bristol does not aver that a physician would not be able to proceed as such.